[No. 22401. Department One. June 24, 1930.]

JOHN GUNSTONE, et al., *Respondents,* v. JAMES E. WALKER, et al., *Appellants.*[1]

R. F. Dotsch, for appellants.
Thos. L. O'Leary, for respondents.

MILLARD, J.—Upon the theory that a resulting trust arose by reason of the following alleged facts, this

[1]Reported in 289 Pac. 53.

action was brought to compel the defendants to execute to the plaintiffs a quitclaim deed for an undivided one-half interest in a parcel of real property used as a dumping ground:

John Gunstone and James E. Walker orally agreed to purchase from the Olympia Brewing Company a tract of land. It was understood that each of the parties was to have an undivided one-half interest in the property; that Gunstone's payment of one-half of the purchase price would be effected by cancellation of Walker's indebtedness to Gunstone in the amount of approximately one hundred and eighty-eight dollars. Walker purchased the land, paying to the brewing company three hundred dollars therefor, and took title to the land in his own name. From the date of purchase to approximately one year prior to the commencement of this action, Gunstone used the land as a log dumping ground and improved the property. The Walkers repeatedly promised to deed to the Gunstones a one-half interest in the property, and admitted frequently that the plaintiffs and defendants were equally interested in the dumping ground. The trial of the cause resulted in findings and judgment in favor of the plaintiffs. The defendants appealed.

▮ Respondents' motion to strike the statement of facts for the reason that each error relied on is not clearly pointed out and separately discussed under appropriate designated headings is denied. It sufficiently appears from the brief that the insufficiency of the evidence on the part of respondents to establish a resulting trust is the error relied upon.

The facts are as follows:

The property in dispute is east of the county road north of the Olympia Brewery at Tumwater. In April, 1923, the appellants bought a log dumping ground (not the property in dispute) west of the county

road. In April, 1924, the respondents became the owners of a one-third or a one-half interest in that dumping ground. That was the only land in the vicinity in which the respondents had any interest. In April, 1923, approximately one year prior to the time the respondents acquired an interest in the property west of the county road, the appellants purchased the two months' unexpired portion from a Mr. Adams of the lease of the dumping ground in dispute. In 1924 Gunstone failed in his endeavor to purchase from the brewing company the dumping ground which is the subject-matter of this controversy. At that time Walker agreed to pay one-half of the purchase price if Gunstone succeeded in buying the land.

In the latter part of 1924 or early part of 1925, Walker was advised by the brewing company that, as he was using the dumping ground, he should pay the taxes thereon and also pay the purchase-price of the land. Walker paid the taxes and placed three hundred dollars in escrow to be paid to the brewing company upon delivery of a deed to him for the land. Not receiving a deed and a lawsuit appearing probable, Walker offered Gunstone a one-half interest in the land if Gunstone would pay one-half of the purchase-price and one-half of the costs of the action in the event that a suit became necessary to obtain a deed. Gunstone rejected Walker's proposition. The controversy was settled without a suit and the brewing company executed a deed to Walker January 18, 1926. Walker testified as follows:

"Well, the first we had why Schmidt was supposed to make out this deed, and he kept fooling along and didn't do it, and finally he told me that he had sold it to another man, and wouldn't give me a deed so I had these letters and I took them over and showed them to Mr. Gunstone and told him if he wanted to go in half on the law suit, I didn't feel like going into it

myself, if he wanted to go in half and pay up, which I would let him have half, and if we couldn't beat it he would be the loser the same as I was. Q. You wanted him to pay half the three hundred dollars you had up? A. Yes, half of the three hundred dollars I had up, and half of the lawyers' fee and the suit and all that sort of thing. Q. Was there anything mentioned by Mr. Gunstone about canceling your indebtedness to him? A. Well, he wasn't in debt to me then. Q. About this canceling your indebtedness to him, he claims that the consideration for the hundred and fifty dollars was the debt which you owed him? A. No, there was nothing said about that at all. Q. Did you at that time owe Mr. Gunstone? A. I don't think I did at that time. Q. You and Mr. Gunstone— A. Of course, I owed him some and he owed me some, just backwards and forwards, you see. There was a whole raft of them putting in logs there and I was supposed to get some money out of the dump and the whole bunch of them—I couldn't recall their names unless I got the records of them—they were dumping logs on this dump. Q. On this dump in controversy? A. No, on the other dump, and Gunstone was putting in logs on that himself on that side, so I didn't know how much he owed me.''

Respondent Flora Gunstone's testimony is corroborative of that of Walker. She testified that:

''They talked about this property and each one bearing half the expense and each one having their half interest in it. That was the general conversation.''

Gunstone testified that Walker at no time promised a deed contingent upon the payment of any particular money; that he, Gunstone, never requested payment of the indebtedness due from Walker, as he figured that paid for a one-half interest in the property.

There is no evidence that it was ever agreed between the parties that the cancellation of the indebtedness was to constitute payment for a one-half interest in the land. The extent of the evidence is that the re-

spondents understood that the cancellation of the indebtedness was their payment for a one-half interest. A few months prior to the time .Walker placed the three hundred dollars in escrow, he and Gunstone struck a balance and the account between them was closed. Respondents contend that appellants were indebted to them in the amount of approximately one hundred and eighty-eight dollars; that all of the items were for services performed and material delivered prior to the execution of the deed, but all were not prior to the time Walker placed his money in escrow. There is a decided conflict in the evidence as to the amount of the indebtedness and the dates the different charges were made. Of the charges, appellants admit the item of towing in the amount of ninety dollars, which covered services rendered subsequent to the date Walker placed the three hundred dollars in escrow. Appellants also admit the correctness of the item of fifteen dollars for rafting three sticks. Accepting respondents' figures, we find that the charges in 1924 are for boom stick, boom chains and balance due on logs totaling seventy dollars. Charges amounting to one hundred and eighteen dollars are itemized as of January, 1925, for towing, boom sticks, rafting and re-rafting logs.

There is no evidence that any consideration was paid by the respondents at any time to the appellants for a one-half interest in the land. Both parties used both dumping grounds for the landing of logs. They jointly owned the dumping ground west of the county road, respondents' interest therein being either one-third or one-half. Respondents were permitted to use the dumping ground in dispute (the one east of the county road) beginning in 1924, but the respondents discontinued the use thereof in 1928, about one year prior to the commencement of this action.

Both parties admit mutual dealings covering the period 1924 to 1928. Their last accounting was a short time prior to the placing of the money in escrow by Walker. It is not clear from the evidence in whose favor a balance is now due. In April or May, 1928, the dumping ground in dispute was leased by the appellants to a Mr. Carlson. It is clear that, at that time, Gunstone did not consider that he had a half interest in the dumping ground. When Gunstone demanded five hundred dollars for lease of the dumping ground west of the county road, the one owned jointly by respondents and appellants, Carlson stated the price was too high. Carlson then called on Walker, who leased to him the dumping ground east of the county road. At that time, Gunstone informed Carlson that he, Gunstone, had nothing to do with the dumping ground on the east side of the county road and any deal made with reference thereto with Walker would be satisfactory to him, Gunstone.

The testimony on the part of respondents that, subsequent to appellants' purchase of the property, Walker promised to Gunstone a deed to a one-half interest in the land is emphatically denied by the appellants. It is admitted that, at the time it appeared doubtful whether a deed could be obtained without a suit, an offer was made as recited above, which offer was rejected by Gunstone. There is no testimony that the appellants promised to the respondents a deed in consideration of cancellation of appellants' indebtedness to respondents. Neither is there any testimony that respondents have ever paid any part of the purchase-price of the land in controversy. One witness testified that, early in 1925, Walker stated to him that the dumping ground in question belonged to Gunstone. Another witness testified that, in May or June, 1927,

Mrs. Walker stated that appellants owned a half interest in the dumping ground.

Manifestly the facts are insufficient to establish a resulting trust in favor of the respondents.

"A parol agreement between two persons to purchase a single tract of land together, where the purchase is finally made by one of them, who pays the whole of the purchase price and takes the title to himself, the other simply agreeing to pay him one-half thereof on demand, does not create a resulting trust in favor of one who contributes nothing to the payment of the purchase price." 26 R. C. L., p. 1220, § 64.

Respondents argue that it was understood that the cancellation of appellants' indebtedness to respondents constituted payment by respondents of one-half of the purchase price of the land. Respondents cite 26 R. C. L., p. 1224, § 69, as follows, to the effect that this was the equivalent of an actual payment in money:

"To the establishment of a resulting trust there must be an actual payment in money, or its equivalent, by the one becoming the *cestui que trust*. But it is not essential that the entire purchase price shall have been paid in money. It is sufficient if the purchase price was secured to be paid at the time of the purchase. Payment may also be made in labor, property or anything of value."

See, also, *Funk v. Hensler,* 31 Wash. 528, 72 Pac. 102.

No money was paid by respondents at the time the purchase was made, nor subsequent thereto. The evidence does not support the contention of respondents that the cancellation of appellants' indebtedness was to be accepted as consideration for a one-half interest in the land. Granting that the respondents and appellants orally agreed to purchase the land together, the appellants paid the whole of the purchase-price and took the title to themselves. When the appellants pro-

posed to 'the respondents that the latter pay one-half of the purchase price and to assume one-half of the costs of a lawsuit that at one time appeared necessary to obtain a deed to the property, the respondents rejected the proposition. They thereby disavowed any prior agreement to acquire an interest in the land, and also declared they did not desire to purchase a half interest in the property.

There is nothing to support the allegation of cancellation of the indebtedness as consideration for a one-half interest in the land except the testimony of the respondents of an understanding on their part to that effect. That is not sufficient. If the appellants were indebted to the respondents, the latter will not be permitted to stand by and make a mental reservation that they will take that out of property that the appellants are purchasing. There is no showing of a meeting of minds to the effect that the appellants promised to advance the three hundred dollars in payment for the land, and that the respondents would cancel appellants' obligations of one hundred and eighty-eight dollars for a one-half interest in the property. Though the purchase of this land had been completed on the credit of both parties and afterwards one of them paid the whole of the purchase-price, that would not of itself give rise to a resulting trust in favor of the other party. *Brooks v. Fowle,* 14 N. H. 248.

"The rule of equity is that a resulting trust must have arisen at the time the purchase was made, and the money or consideration must have been paid, or secured to be paid, by such third party at or before the purchase." *Norton v. Brink,* 75 Neb. 566, 110 N. W. 668, 669, 7 L. R. A. (N. S.) 945.

The permanent improvements which respondents claim to have placed upon the property consist

of brow logs and skids. In 1924 or 1925, the respondents were permitted to use the land to dump their logs thereon. A landing was necessary, therefore they built one at a cost of approximately eighty dollars. In the spring of 1927, one Looney, to whom respondents advanced money for logging purposes, used the dumping ground, and he built a second dump or landing at a cost to the respondents, so they testified, of two hundred dollars. The second dump is still in use. It clearly appears from the evidence that every one dumping logs constructs his own landing at his own expense; that the improvements are in no sense permanent, the skids lasting one day or longer, all dependent on the size and number of the logs and the manner in which they are dumped.

The judgment is reversed and the cause remanded with instructions to dismiss the action.

MITCHELL, C. J., BEALS, TOLMAN, and MAIN, JJ., concur.